UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

U.S. DISTRICT COURT
BANGOR, MAINE
RECEIVED AND FILED

2007 AUG 31  P 1: 38

BY_____
     DEPUTY CLERK

JOANNE M. MILLAY, as parent of )
minor child, )
     Plaintiff, )
 )
 )  Civil No. 07-129-B-W
 )
SCHOOL UNION #92, )
 )
     Defendant. )

## COMPLAINT AND MOTION FOR PRELIMINARY EMERGENCY INJUNCTION

1. Now comes the Plaintiff, on behalf of the minor child named Y____ R. Millay, a citizen of the United States residing with the Plaintiff at 771 Newbury Neck Road, Surry, Maine 0468, with a Complaint v. School Union #92, located at 443 Main Street, Ellsworth, Maine 04684, administered by Superintendent James Boothby and Special Education Director Roland Caron.

2. The basis of the Complaint and Motion for Preliminary Emergency Injunction is the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act, and the Americans with Disabilities Act, which mandate that essential education services and placement in the least restrictive environment be provided to all students with disabilities; and the U.S. Civil Rights Act, which prohibits discrimination in regard to such services.

3. The background: Y____ has been totally blind since birth, and has moderate hearing loss, so that she is considered a student who is deaf-blind. In addition, she has delays in development. She is nearly 14 years of age. For her first six years of education, she was a full-time student at the Surry Elementary School in a self-contained classroom. Services in her Individual Education Plan (IEP) were often not adequately provided; at one point, a hearing officer contracted by the Maine Department of Education found grave deficiencies in the school district's proposed IEP and ordered corrective measures. Another time, the state found that Y____ had illicitly been denied any education placement by the school district, fraudulently claiming inability to hire (available) staff.

4. By the time Y____ was completing grade 5, the recurrent deficiencies in her education program were such that she could make little progress, even in areas in which she had been progressing at home. Staff at the Surry school were not being permitted opportunities for training to educate a deaf-blind child, such as were offered by the New England Regional Deaf-Blind Program, and other facilities. The lack of communication capability by staff to the child and the inadequate program both increasingly contributed to the student's frustration, and impelled the parent to agree to a trial period in a specialized education program, the deaf-blind program at the Perkins School for the Blind in Watertown, Massachusetts, in September 2005.

*Jm. McLay*

Folder Location: ___
File Name: jmw07cv129 Cmp
Names of Attachments, if any: jmw07cv129.A-D

5. While the Perkins program was exemplary and the child made excellent progress, she was unable to remain in the program due to her health. The transition away from home was overwhelming and caused a severe adjustment reaction, and, on November 30, 2005, Y█████ was hospitalized following a period of anorexia that resulted in loss of mobility and in symptoms that resembled a severe stroke. This adjustment reaction occurred even though the Plaintiff personally brought the child home every weekend for three months, 20 hours' drive weekly, while the school district refused to provide transportation that was ordered by the PET.

6. From December 2005 through February 2006, Y█████ remained in the home and underwent medical testing. By March, her physicians stated that she was well enough to return to school and a brief trial of three days at the Perkins School was attempted, but it failed, again due to the child's extreme anxiety. At the end of March, the Plaintiff requested School Union #92 to resume the child's education at the Surry school. By that time, however, another student was occupying her space in the Life skills program, and Y█████ was denied education services except for one hour per day in a small room alone, over the objections of the Plaintiff and in violation of her IEP. The time was supposed to increase daily, but did not. Y█████ was kept socially isolated and she did not receive any of the services that were in her IEP, including evaluations ordered by her Pupil Evaluation Team. Plaintiff discontinued this "placement" after one week because the child became distressed, and Plaintiff then negotiated with former Superintendent of Schools William Fowler to permit the parent to develop an appropriate education program over the summer of 2006 and then transition the child full-time into the life skills program with trained staff.

7. The Plaintiff is a certified special education teacher, and successfully trained staff and implemented the child's IEP throughout July and August 2006, with the exception of a psychological consult for the child that the school district refused to allow her to schedule, despite the PET order. However, in September, the school union hired new staff who were untrained; it refused to provide transportation, adaptive equipment, and other needs to the child, and again failed to provide the support services – such as occupational therapy, language therapy, and psychological consult – that were in her IEP. Within one month, the child's confusion and elevated level of distress caused her to engage in self-injurious behavior and to refuse even to enter her classroom. School staff, including the Principal to whom Plaintiff directly appealed, failed to address this and the child was injured. Therefore, in late September 2006, after only three weeks, Plaintiff was impelled to remove the child from the school and requested a meeting with school administrators, at which she requested an alternate public placement.

8. The school union has a larger life skills program at the Trenton School, and another child who had received an inappropriate program at Surry was then thriving there. The school administrators, however, refused to place Y█████ in that program, citing lack of space. They did not offer Y█████ any alternate program. In November 2006, Plaintiff filed a complaint with the U.S. Department of Education, Office for Civil Rights, which accepted the case and scheduled an on-site investigation for February 14th and 15th, 2007. On those dates, a severe snowstorm prevented the team traveling from Boston, and the

civil rights attorney asked Plaintiff to file a due process complaint with the state, which it would evaluate. Plaintiff filed a complaint with the Maine Department of Education in February, and it conducted an intensive investigation over the next five months.

9. In March 2007, while the investigation was in process, Plaintiff enrolled Y█████ and her sister in the Mount Desert Island High School, with which Surry has a contract, and which has an excellent life skills program. On March 23, Plaintiff and the special education director, Kelly Sanborn, requested of School Union #92 and the Education Cooperative a Pupil Evaluation Team meeting (PET) for Y█████ to facilitate her transition to the High School by September 2007. School Union #92 however failed to schedule the meeting or to return telephone calls and letters in regard to it. Instead, School Union #92 special education director Roland Caron unilaterally wrote a defamatory "Individual Education Plan" that portrayed the student as uneducable. He sent this to Ms. Sanborn, and I became aware of it when she called me with her concerns.

10. The PET meeting was finally held in late June 2007, and School Union #92 refused placement at MDI, instead offering a highly restrictive placement twice as far from home, the Stillwater Academy in Bangor. All PET members except Mr. Caron rejected the placement. He therefore stated that, since consensus could not be reached, he would determine the placement unilaterally.

11. In July 2007, the Maine Department of Education completed its investigation, which is disclosed in the attached report. Numerous violations of law were found, two of which have been referred to the state Attorney General's office for investigation. The Maine Department of Education set forth a corrective action plan, and ordered the school union to find an immediate education placement for the student.

12. However, special education director Roland Caron, ignoring the wishes of all other PET members, merely repeated the offer of an inappropriate placement, this time the Kids Peace "autism program" in Ellsworth, which has students who would be a physical danger to a child who is deaf-blind. This is a far more restrictive placement than the MDI life skills program or the Perkins deaf-blind program. Mr. Caron's rationalization is that Y█████ had been previously attending a deaf-blind program and therefore cannot be educated in a public school, and that she herself was responsible for the failure of the September 2006 Surry program. However, such had not been the state's finding.

13. Moreover, Mr. Caron's dismissal of the mandate of all PET members who have direct knowledge of the child was a violation of federal law, which provides for decision-making to be shared equally between the parent and the school district, with especial responsibility for ensuring *least restrictive placement* falling to the special education director. The PET is, by law, not an advisory board whose wishes can be disregarded, but a decision-making board; a special education administrator who is out of step with the entire board may not claim unilateral privileges to make a placement decision that it is otherwise universally believed will bring harm to the child. This is especially true when the special education director in question previously abused his authority by

*[signature]*

denying the child all education services, in clear violation of federal and state law, as the Maine Department of Education attorneys have reported in the enclosed document.

14. The school district's rationalization further ignores that the Perkins deaf-blind program is a private education day program (Y▓▓ and a few other students had to board at the school because of distance, but this was separate from the deaf-blind day program) into which Y▓▓ was placed voluntarily to insure the provision of services, which the state has now ordered to be provided anyway; and that all of these services can be provided in a public school program. It also ignores the reasons for the failure of the Surry program, which the state set forth in its report. Nowhere does the report blame the student for the failure of that placement, nor does it recommend transitioning the student to a more restrictive placement, for which there is in fact no justification and no benefit.

15. There would, however, be benefit to the school district: it would have to pay the tuition and special services costs at the MDI high school, but a more restrictive placement would be covered by state funding. The school district also might be more clearly at fault in the failure of the placement at Surry and the subsequent injury to the child, when an alternate public school placement, such as the MDI high school, should prove successful. It does appear to have allowed these considerations to overshadow the pressing needs of the child and the clear requirements of applicable federal education and civil rights laws.

16. Plaintiff has spent an unusual amount of time and expense attempting to serve the child's needs amidst the opposition and deleterious failures of the school district. Plaintiff has been virtually forced to educate the child full-time at home for most of the past two years, with resources from the community as available, and with a refusal even of reimbursement of time and expenses from the school district. Plaintiff has attended numerous meetings and spent countless hours participating in education complaints and paperwork that have resulted in the child continuing to have no appropriate placement.

17. Susan Parks, the due process consultant for the Maine Department of Education, has offered that the state would now conduct a due process hearing in regard to this new issue of placement, and Plaintiff may avail herself of this option. Plaintiff may also return the case to the U.S. Department of Education Office for Civil Rights for its further investigation. Either of those acts will, however, necessitate that the child remain without an education placement for the coming school year while the case is pending, given the time frames for complaint, possible appeals by the school district, etc.

18. Wherefore, Plaintiff requests of the Court an emergency preliminary injunction to order that the child be placed in school in the least restrictive environment, which is the MDI high school in which she is enrolled with her sister, with services as set forth in her undisputed Individual Education Plan, while the issue of placement is finally resolved in other venues. There could be no harm to the child from this placement. Plaintiff further requests attorney fees and a juried hearing to determine compensation to parent and child.

Respectfully submitted, this 30th day of August, 2007, by Joanne M. Millay, on behalf of Y▓▓ R. Millay.

771 Newbury Neck Rd
Surry ME 04684
Tel 207-667-8331

JM. Millay